FILED

2008 Feb-27  PM 06:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CHERYL L. BYRAM,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.:** |
| ) | |
| **AMSHER COLLECTION** ) | |
| **SERVICES, INC. [also d/b/a** ) | |
| **AMCHEK COLLECTIONS], a** ) | |
| **Corporation; PREMIER CREDIT** ) | |
| **OF NORTH AMERICA, LLC, a** ) | |
| **Corporation,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

**COMES NOW** the Plaintiff, by and through counsel, in the above styled

cause, and for Plaintiff's Complaint against the Defendants states as follows:

### Jurisdiction & Venue

1. This is an action brought by the Plaintiff consumer for violations of the Fair

    Debt Collection Practices Act (15 U.S.C. § 1692 et seq. [hereinafter

    "FDCPA"])[1] regarding inaccurate entries on Plaintiff's credit reports and

    violations of other applicable federal laws by Defendants AmSher Collection

---

[1] Any reference to the Fair Debt Collection Practices Act or the Fair Credit Reporting Act or any
part (of either statute) encompasses all relevant parts and subparts thereto.

Services, Inc. [also d/b/a Amchek Collections] and Premier Credit of North America, LLC, who are "debt collectors" under the FDCPA and the debts in question are consumer debts.  Therefore, subject matter jurisdiction exists under 28 U.S.C. Section 1331.

2.     The state law claims are also properly before this court based upon supplemental jurisdiction under 28 U.S.C. Section 1367 as the state law claims form part of the same case or controversy as the federal claims as they are based upon substantially similar and overlapping facts.

3.     The Plaintiff, Cheryl L. Byram, ("Plaintiff"), is a natural person who is a resident of this judicial district.

4.     Defendant AmSher Collections Services, Inc. [also d/b/a Amchek Collections] ("Defendant" or "AmSher") is an Alabama debt collection company that engages in business in this judicial district.

5.     Defendant Premier Credit of North America, LLC ("Defendant" or "Premier") is a foreign debt collection company that engages in business in this judicial district.

## FACTS – BANKRUPTCY AND CURRENT REPORTING

6.     Plaintiff filed bankruptcy and was discharged on February 5, 2007, with all Defendants receiving a copy of the discharge order. The case number was

06-04136-TOM7 and it was filed in the Southern District of Alabama Bankruptcy Court.

7.  Despite the court order, AmSher has continued to report Plaintiff's account to Experian, Equifax and TransUnion of the national consumer-reporting agencies ("CRAs") as having a current balance owed of approximately $126.00, which is incorrect and false.

8.  AmSher has intentionally not reported to the CRAs that the account was included in bankruptcy and that it should have a zero balance.

9.  AmSher has intentionally and maliciously refused to report the true balance to the CRAs when AmSher knew that the debt was discharged in bankruptcy.

10. Despite the court order, Premiere has continued to report Plaintiff's account to Experian and TransUnion as having a current balance owed of approximately $392.00, which is incorrect and false.

11. This reporting by Premiere has occurred as recently as April 2007.

12. Premiere has intentionally not reported to the CRAs that the account was included in bankruptcy and that it should have a zero balance.

13. Premiere has intentionally and maliciously refused to report the true balance to the CRAs when Premiere knew that the debt was discharged in bankruptcy.

14.   Plaintiff has specifically requested all Defendants to correct their false reporting but the Defendants have refused to do so and therefore this suit was filed.

15.   The effect of these errors on Plaintiff's credit reports has been to negatively impact Plaintiff's credit report, credit worthiness, and Plaintiff's credit score.

16.   Following the discharge, each Defendant engaged in debt collection activity against Plaintiff by reporting to the CRAs that Plaintiff was still personally liable for the balance due on the accounts in question despite the fact that the accounts were discharged, which extinguished each Defendant's right to collect the account and Plaintiff's legal obligation to pay the accounts. Once each Defendant received notice of the bankruptcy discharge and the resulting change in the legal status of the debt, the Defendant had a duty to report it as such.

17.   Despite the change in the legal status of the account, each Defendant has continued to report, by at least written communications, to one or more CRAs that Plaintiff remains personally liable for current balance as reported by each Defendant. Additionally, each Defendant has stated that it retains the legal right to collect the debt.

## FACTS - DAMAGES

18.   The conduct of the Defendants[2] has proximately caused Plaintiff past and future monetary loss, past and future damage to Plaintiff's credit and credit worthiness, past and future mental distress and emotional anguish and other damages that will be presented to the jury.

## FACTS – DEFENDANT'S KNOWLEDGE OF THEIR WRONGFUL CONDUCT

19.   Defendants each knew and continue to know that a discharge order means the consumer no longer owes the debt and has no personal liability to each Defendant for the discharged debt but each Defendant has made a corporate decision to willfully and maliciously act contrary to its knowledge in its calculated decision to violate the requirements to properly report and update the Plaintiff's accounts.

20.   These written statements sent by each Defendant to one or more of the CRAs are incorrect, false, and defamatory because the alleged debt was discharged in bankruptcy which extinguished Plaintiff's legal obligation to repay the debt and Defendant's right to collect the debt.

21.   Each Defendant is fully aware of how to report to the CRAs, that a debt has been discharged in bankruptcy. By reporting that Plaintiff continues to owe a

---

[2] To be clear "Defendants" means each Defendant in this case.

balance to each Defendant, the Defendants are unambiguously stating that Plaintiff has a legal obligation to repay the debt. A third party which obtains Plaintiff's credit report will naturally either assume that this pre-petition debt was reaffirmed in the bankruptcy and Plaintiff failed to pay the debt after reaffirming it or that each Defendant asserted a dischargeability complaint against Plaintiff and prevailed.

22.  Each Defendant has intentionally not reported to the CRAs that the account was included in bankruptcy and that it should have a zero balance. When it received notice of Plaintiff's discharge, the Defendant had an absolute duty under 15 U.S.C. § 1681s-2(a), to report the account as "discharged [or included] in bankruptcy," report a zero balance due and report the account as closed.

23.  The Defendants each have willfully and maliciously failed to report the account as having a "0" balance as required by 16 CFR § 607 (6), which states, "a consumer report may include an account that was discharged in bankruptcy (as well as the bankruptcy itself), as long as it reports a zero balance due to reflect the fact that the consumer is no longer liable for the discharged debt."

24.  The Defendants each have promised through their subscriber agreements or contracts with each CRA to update accounts to make them accurate which

includes accounts that have been discharged in bankruptcy but the Defendants each have willfully, maliciously, recklessly, wantonly, and/or negligently failed to follow this requirement as well as the requirements set forth under the Fair Credit Reporting Act (FCRA) and state law which has resulted in the intended consequences of this false information remaining on Plaintiff's credit reports.

25.    In the context of parking an account, the Defendants each have an obligation and duty under federal and state law to accurately report the balance and the Defendants each willfully and maliciously refuse to obey federal and state law.

26.    Defendants have agreed to follow and understand they must follow the requirements of the FCRA including:

• 15 U.S.C. § 1681(a)(1)(a) which states:

"A person shall <u>not furnish</u> any information relating to a consumer to any consumer reporting agency if the person <u>knows or has reasonable cause to believe that the information is inaccurate</u>."

• 15 U.S.C. § 1681(a)(1)(B) which states:

"A person shall <u>not furnish information</u> relating to a consumer to any consumer reporting agency if –

(i)    the person has been notified by the consumer[3], at the address specified by the person for such notices, that specific information is inaccurate; and

---

[3] The notice here comes from the federal bankruptcy court relating directly to the consumer.

(ii)    the <u>information is, in fact, inaccurate</u>.”

• 15 U.S.C. § 1681(a)(2) which states:

“ A person who –

(A)    regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and

(B)    <u>has furnished</u> to a consumer reporting agency information that the person <u>determines is not complete or accurate</u>, <u>shall promptly notify</u> the consumer reporting agency of that determination and provide to the agency <u>any corrections</u> to that information, or any additional information, that is <u>necessary to make</u> the <u>information</u> provided by the person to the agency <u>complete</u> and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.”

[Emphasis added].

27.    Defendants each have a duty under Alabama law to act reasonably under the circumstances.

28.    Defendants each have violated this duty under Alabama law by failing to act reasonably under the circumstances which include, but are not limited[4] to, the following:

•    Defendant previously reported a balance owed by Plaintiff;

•    Defendant routinely updates credit reports;

---

[4] Until discovery is completed, Plaintiff cannot know all the circumstances for each Defendant.

- Defendant received notice of the Plaintiff's filing of a bankruptcy petition;

- Defendant failed to object to its debt being discharged;

- Defendant received notice[5] the debt was discharged;

- Defendant understands the legal effect of a discharge;

- Defendant knows that a user of a credit report of Plaintiff will see a "current balance" of more than zero.

- Defendant knows the account reported to the CRAs does not show that the account was discharged;

- Defendant knows that leaving a balance on a discharged account will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows that failing to note the account is discharged will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows it is an extraordinarily easy matter to update the Plaintiff's credit report to show a zero balance and discharge;

---

[5] Defendant either received notice directly from the bankruptcy court or from the company that the Defendant bought the account from or that assigned the account to the Defendant.

- Defendant knows and has agreed in its subscriber agreement with each CRA that it must follow the FCRA which requires inaccurate information to be updated and corrected;

- Defendant has chosen to not update the account; and

- Defendant knows its actions will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

29. The Defendants each have a policy and procedure to refuse to properly update credit reports of consumers, like the Plaintiff, who have discharged the debts. The reason is to keep false information on the credit report. The false information consists of a balance shown as owed (when each Defendant has known since discharge that no balance is owed) and intentionally refusing to show a current status of "discharged in bankruptcy".

30. Defendants each update many accounts each month with allegedly the correct information regarding the balance but have willfully and maliciously refused to do so with Plaintiff and with others who are similarly situated who have received a discharge order on each of Defendants' debts.

### FACTS – MOTIVE FOR WRONGFUL CONDUCT

31. The Defendants each have a policy to "park" their accounts on at least one of the consumer's credit reports. This is a term in the industry for keeping a false balance (or false account) on the credit report so that the consumer will

be forced to pay off the balance in order to obtain a refinancing, to qualify for a loan, or to increase the consumer's credit score from the artificially lowered score which directly resulted from each of the Defendants' intentional and malicious conduct.

32.   When the consumer who has discharged the debt pays the "parked" account, the Defendants each claim that such payment was purely "voluntarily" or was to pay off a "moral obligation". The Defendants each know and intend that by willfully and maliciously parking the account on the credit report, illegal payment can be extorted from the group of consumers in the same position as Plaintiff.

33.   The Defendants each know that parking a balance will lead to false and defamatory information being published every time the Plaintiff's credit report is accessed and this is the malicious and intentional design behind each of the Defendants' actions with the goal to force the Plaintiff to pay on an account he does not owe.

34.   In order to provide background information on the practices of the credit industry related to the purchasing and collection of discharged debt (including collection by leaving false balances on credit reports – "parking") the Plaintiff refers this Honorable Court to the November 12, 2007, article "Prisoners of Debt" in Business Week. The url accessed on December 1,

2007,  is   http://www.businessweek.com/magazine/content/07_46/b4058001.htm

and for the Court's convenience, a "printer friendly" version is attached as

Exhibit "A."

35.    Just one quote from the Business Week article sums up the problem facing

discharged consumers such as Plaintiff:

The very existence of this marketplace confounds even some veterans
in the bankruptcy field. During a preliminary hearing in New York in
March, U.S. Bankruptcy Judge Robert Drain asked a lawyer for
JPMorgan Chase (JPM) how the bank had managed to sell consumer
credit-card debts that had been discharged. "I don't know who would
buy a discharged account," the perplexed judge said.

"Happens all the time, your honor," the Chase lawyer, Thomas E.
Stagg, responded.

Drain's confusion is understandable. Traditionally, discharged debt
was seen as not worth the paper it's written on. Once a judge excuses
some of a debtor's obligations – part of the bankruptcy system's goal
of granting a financial fresh start – that person has no legal duty to pay
them. In fact, bankruptcy law prohibits efforts to collect discharged
debt.

In the 1990s, businesses adept at tracking and trading consumer debt
expanded their reach to dabble in accounts enmeshed in bankruptcy.
That dabbling has grown into a robust market. Some of the trade in
so-called bankruptcy paper involves debts that remain collectible.
What's troubling is that the market now also includes billions in
discharged debts, which ought to have no dollar value. Owners of
canceled liabilities can revive their value in two main ways: by
directly pressuring consumers to cough up cash or by gaming the
credit system, as allegedly happened in the Rathavongsa case.

[Emphasis added].

36.  In the alternative, creditors or debt collectors such as Defendants frequently sell their charged-off accounts to debt buyers through forward flow agreements or Credit Card Purchase Agreements.

37.  In these contracts, the sellers frequently have a provision which allows them to retain a fee or a percentage of any debt that it collects on behalf of buyers of the accounts.

38.  It is a common practice for creditors or debt collectors to fail to update their credit reporting on accounts that they have sold to third parties, on one or more CRAs of a given account holder, in hopes that they can collect the account on behalf of the debt buyer and ear a fee or percentage of the account balance for doing so. Additionally, the creditors know that a large percentage of these portfolios of debt will lose all their value for resale purposes if the accounts that are discharged in bankruptcy actually report the bankruptcy discharge and a zero balance.

39.  After a reasonable opportunity for discovery, Plaintiff believes that the contract, under which the account in question was sold to a debt buyer, has a provision which provides a financial incentive for each Defendant to continue to attempt to collect Plaintiff's account.

40.     After a reasonable opportunity for discovery, Plaintiff believes that the evidence will demonstrate that each Defendant had a financial motive to fail to report the sale of this account.

41.     After a reasonable opportunity for discovery, Plaintiff believes that the evidence will demonstrate that each Defendant knew at the time it last reported on Plaintiff's account, that the account was pledged to be sold to a debt buyer pursuant to the terms of an ongoing contract or agreement.

42.     After a reasonable opportunity for discovery, Plaintiff believes that the evidence will demonstrate that each Defendant knowingly and deliberately failed to report the sale of this account to one or more of the national CRAs.

43.     After a reasonable opportunity for discovery, Plaintiff asserts that each Defendant is fully aware that reporting an account as a "charge off" or a "balance due" or other similar derogatory notation or comment brings to bear the full coercive power to force a debtor to pay discharged debt or suffer very real consequences financially, to reputation and to their credit rating.

44.     After a reasonable opportunity for discovery, Plaintiff will have evidentiary support to show that the FICO$^{©}$ scoring models continue to penalize the "debtors" such as Plaintiff for illegal and defamatory reporting such as each of the Defendant's reporting that is the subject of this complaint.

45. Had each Defendant properly reported the debt as discharged, with a zero balance due, and listed the account as closed, Plaintiff would only have suffered the inherent negative effects of filing for bankruptcy. Because the Defendants elected to violate state and federal law, Plaintiff has suffered additional damages and harm from the Defendants' false allegations that Plaintiff is still personally liable for the debt.

46. As a natural consequence of each Defendant reporting that the debtor is still personally liable on a pre-petition debt, potential lenders, landlords, insurance companies, utilities, and potential employers who view the credit report often believe that the Plaintiff has engaged in some sort of bad conduct as an explanation of why the debt was not discharged in bankruptcy.

## FACTS – NOTICE TO DEFENDANTS OF THEIR WRONGFUL CONDUCT

47. Despite receiving notice that the Defendants' reporting on accounts included in bankruptcy was false, the Defendants each have intentionally and knowingly not corrected their policy of keeping false and damaging information on at least one of the Plaintiff's credit reports. This notice has been provided directly to Defendants from consumers, from the CRAs, and other sources.

## FACTS – SUMMARY OF WRONGFUL CONDUCT

48. It is a practice of each of the Defendants to maliciously, willfully, recklessly, wantonly, and/or negligently violate, ignore, and refuse to follow the requirements of the federal and state law.

49. All actions taken by employees, agents, servants, or representatives of any type for Defendants were taken in the line and scope of such individuals' (or entities') employment, agency, or representation.

50. All actions taken by the Defendants were done with malice, were done wantonly, recklessly, intentionally or willfully, and were done with either the desire to harm Plaintiff and/or with the knowledge that their actions would very likely harm Plaintiff and/or that their actions were taken in violation of the law.

51. Defendants have each engaged in a pattern and practice of wrongful and unlawful behavior with respect to accounts and consumer reports and therefore Defendants are each subject to punitive damages, statutory damages, and all other appropriate measures to punish and deter similar future conduct by Defendants and similar companies.

## FIRST CLAIM FOR RELIEF
## <u>Violations of the Fair Debt Collection Practices Act</u>

52.   All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

53.   Defendants AmSher and Premiere are debt collectors under the FDCPA and violated the FDCPA in numerous ways, including, but not limited to, the following:

   a.   Falsely reporting a balance owed on Plaintiff's credit report;

   b.   Falsely attempting to collect a debt (through the reporting of a balance and the refusal to correct the false reporting) when there is no legal right to collect the discharged debt;

   c.   Taking action to try to collect the discharged debt when such action is illegal;

   d.   Refusing to mark the account as "disputed;" and

   e.   Refusing to properly update the account.

54.   Plaintiff has been damaged as a direct result of these violations of the FDCPA as set forth in this Complaint.

## SECOND CLAIM FOR RELIEF
## <u>Defamation</u>

55.   All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

56. Defendants each published false information about Plaintiff by reporting to one or more of the CRAs the Defendants' accounts with a false balance.

57. Each time the credit reports of Plaintiff were accessed, a new publication occurred, which was the result intended by each of the Defendants.

58. Plaintiff alleges that the publications and defamations were done maliciously, without privilege, and with a willful intent to injure Plaintiff.

59. Plaintiff has been damaged as a proximate result of each Defendant's wrongful conduct as set forth in this Complaint.

60. Such statements exposed Plaintiff to contempt, ridicule and/or financial injury at the hands of those to whom the report was published. Most, if not all of those who saw the report were in a position to grant or deny credit, or to enter into some business transaction with Plaintiff such as an insurance contract. The people to whom the report was published were those to whom Plaintiff's credit reputation was most important. The audience for the defamatory statements was particularly interested in the information stated by the Defendants and were particularly situated to harm Plaintiff, as a result of the Defendants' actions, by denying Plaintiff credit or insurance or other business dealings of varying types.

61. Plaintiff has requested in writing that each Defendant correct these defamatory statements and the required five days has elapsed which allows

punitive damages to be entered against each Defendant for defamation under Alabama law.

## THIRD CLAIM FOR RELIEF
### Negligent, Reckless, and Wanton Conduct

62.  All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

63.  Defendants each assumed a duty, through the subscriber agreement and other actions, to accurately report the balances of Defendants' accounts after individuals, like the Plaintiff, received a discharge.

64.  Defendants have agreed to follow and understand they must follow the requirements of the FCRA including:

• 15 U.S.C. § 1681(a)(1)(a) which states:

"A person shall <u>not furnish</u> any information relating to a consumer to any consumer reporting agency if the person <u>knows or has reasonable cause to believe that the information is inaccurate</u>."

• 15 U.S.C. § 1681(a)(1)(B) which states:

"A person shall <u>not furnish information</u> relating to a consumer to any consumer reporting agency if –
(iii)  the person has been notified by the consumer[6], at the address specified by the person for such notices, that specific information is inaccurate; and
(iv)  the <u>information is, in fact, inaccurate</u>."

• 15 U.S.C. § 1681(a)(2) which states:

---

[6] The notice here comes from the federal bankruptcy court relating directly to the consumer.

" A person who –
(C)     regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and
(D)     has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not  complete or accurate."

[Emphasis added].

65.     Defendants each have a duty under Alabama law to act reasonably under the circumstances.

66.     Defendants each have violated this duty under Alabama law by failing to act reasonably under the circumstances which include, but are not limited[7] to, the following:

•       Defendant previously reported a balance owed by Plaintiff;

•       Defendant routinely updates credit reports;

•       Defendant received notice of the Plaintiff's filing of a bankruptcy petition;

•       Defendant failed to object to its debt being discharged;

---

[7] Until discovery is completed, Plaintiff cannot know all the circumstances for each Defendant.

- Defendant received notice the debt was discharged;

- Defendant understands the legal effect of a discharge;

- Defendant knows that a user of a credit report of Plaintiff will see a "current balance" of more than zero.

- Defendant knows the account reported to the CRAs does not show that the account was discharged or included in a Chapter 7 bankruptcy;

- Defendant knows that leaving a balance on a discharged account will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows that failing to note the account is discharged or included in a Chapter 7 bankruptcy will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows it is an extraordinarily easy matter to update the Plaintiff's credit report to show a zero balance and discharge or included in Chapter 7 Bankruptcy;

- Defendant knows and has agreed it must follow the FCRA which requires inaccurate information to be updated and corrected;

- Defendant has chosen to not update the account; and

- Defendant knows its actions will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

67. Defendants each violated all of the duties the Defendants had and such violations were made recklessly, wantonly, and negligently as Defendants refused to comply with all of the duties each Defendant had.

68. It was foreseeable, and each of the Defendants did in fact foresee it, that refusing to properly update would cause the exact type of harm suffered by the Plaintiff.

69. Defendants each acted with negligence, wantonness, and/or recklessness conduct in their dealings with and about Plaintiff as set forth in this Complaint. This includes the initial reporting of Defendants' accounts; the refusal to properly update the accounts; and all other aspects as set forth in this Complaint.

70. Plaintiff has been damaged as a proximate result of each Defendant's wrongful conduct as set forth in this Complaint.

## FOURTH CLAIM FOR RELIEF
## <u>Malicious, Intentional and Willful[8] Conduct</u>

71.   All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

72.   Defendants each assumed a duty, through the subscriber agreement and other actions, to accurately report the balances of Defendants' accounts after individuals, like the Plaintiff, received a discharge.

73.   Defendants have agreed to follow and understand they must follow the requirements of the FCRA including:

• 15 U.S.C. § 1681(a)(1)(a) which states:

"A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person <u>knows or has reasonable cause to believe that the information is inaccurate</u>."

• 15 U.S.C. § 1681(a)(1)(B) which states:

"A person shall <u>not furnish information</u> relating to a consumer to any consumer reporting agency if –
(v)   the person has been notified by the consumer[9], at the address specified by the person for such notices, that specific information is inaccurate; and
(vi)   the <u>information is, in fact, inaccurate</u>."

---

[8] Even though this is in a different "Claim For Relief", a recent U.S. Supreme Court opinion dealing with the FCRA has held that there is no distinction between wanton (reckless) conduct and intentional (willful) conduct. *See Safeco Ins. Co. v. Burr*, 127 S.Ct. 2201, 2207-10 (2007)(citing *Prosser's Law of Torts* "Although efforts have been made to distinguish the terms 'willful,' 'wanton,' and 'reckless,' such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit").

[9] The notice here comes from the federal bankruptcy court relating directly to the consumer.

• 15 U.S.C. § 1681a(2) which states:

" A person who –
(E)    regularly and in the ordinary course of business furnishes
       information to one or more consumer reporting agencies about
       the person's transactions or experiences  with any consumer;
       and
(F)    has furnished to a consumer reporting agency information that
       the person determines is not complete or accurate, shall
       promptly notify the consumer reporting agency of that
       determination and provide to the agency any corrections to that
       information, or any additional information, that is necessary to
       make the information provided by the person to the agency
       complete and accurate, and shall not thereafter furnish to the
       agency any of the information that remains not  complete or
       accurate."

[Emphasis added].

74.    Defendants each have a duty under Alabama law to act reasonably under the
       circumstances.

75.    Defendants each have violated this duty under Alabama law by failing to act
       reasonably under the circumstances which include, but are not limited[10] to,
       the following:

       •      Defendant previously reported a balance owed by Plaintiff;

       •      Defendant routinely updates credit reports;

       •      Defendant received notice of the Plaintiff's filing of a bankruptcy
              petition;

---

[10] Until discovery is completed, Plaintiff cannot know all the circumstances for each Defendant.

- Defendant failed to object to its debt being discharged;

- Defendant received notice the debt was discharged;

- Defendant understands the legal effect of a discharge;

- Defendant knows that a user of a credit report of Plaintiff will see a "current balance" of more than zero.

- Defendant knows the account reported to the CRAs does not show that the account was discharged or included in a Chapter 7 bankruptcy;

- Defendant knows that leaving a balance on a discharged account will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows that failing to note the account is discharged or included in a Chapter 7 bankruptcy will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows it is an extraordinarily easy matter to update the Plaintiff's credit report to show a zero balance and discharge or included in Chapter 7 bankruptcy;

- Defendant knows and has agreed it must follow the FCRA which requires inaccurate information to be updated and corrected;

- Defendant has chosen to not update the account; and

- Defendant knows its actions will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

76. Defendants each violated all of the duties the Defendants had and such violations were made intentionally, willfully, and maliciously as Defendants refused to comply with all of the duties each Defendant had.

77. Each Defendant has acted in utter disregard for the rights of the Plaintiff and has decided to take (or fail to take) action which Defendant knows or is substantially certain will result in harm to Plaintiff. The Defendants have acted wrongfully without just cause or excuse as Defendants have and had an intent to harm the Plaintiff and/or acted with an evil intent.

78. It was foreseeable, and each of the Defendants did in fact foresee it, that refusing to properly update would cause the exact type of harm suffered by the Plaintiff.

79. Defendants each acted with malice and/or intentional (willful) conduct in their dealings with and about Plaintiff as set forth in this Complaint. This includes the initial reporting of Defendants' accounts; the intentional refusal to properly update the accounts; and all other aspects as set forth in this Complaint.

80. Plaintiff has been damaged as a proximate result of each Defendant's wrongful conduct as set forth in this Complaint.

## FIFTH CLAIM FOR RELIEF
### Invasion of Privacy

81.   All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

82.   Defendants each recklessly, intentionally, and/or willfully invaded the privacy of Plaintiff as set forth in Alabama law, including publishing false information about Plaintiff's personal financial obligations and refusing to properly update the credit reports as described in this Complaint.

83.   Plaintiff has been damaged as a proximate result of each Defendant's wrongful conduct as set forth in this Complaint.

## SIXTH CLAIM FOR RELIEF
### Misrepresentation and/or Suppression

84.   All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

85.   Defendants each intentionally, maliciously, recklessly and/or negligently have committed misrepresentations of material facts in that each of the Defendants has falsely represented that Plaintiff owes money to that Defendant and has suppressed the truth that Plaintiff no longer has any personal liability to any of the Defendants and that the accounts in question have been discharged.

86.   Defendants have each intended that the CRAs and all who review the credit reports of Plaintiff will rely upon the misrepresentations and suppressions of material facts related to the balance owed and the lack of indication that the accounts were discharged or included in bankruptcy.

87.   Defendants have each intended that the justifiable and reasonable reliance by others would adversely affect the Plaintiff and that has been the result.

88.   Such negligence, malice, wantonness, recklessness, willfulness, and/or intentional conduct related to the misrepresentations and suppressions of material facts has proximately caused the damages set forth in this complaint.

## **RELIEF SOUGHT**

89.   An award of statutory, actual, compensatory and punitive damages, and costs of the action including expenses, together with reasonable attorney's fees, against each Defendant for each Defendant's wrongful conduct.

90.   Plaintiff also requests all further relief to which Plaintiff is entitled, whether of a legal or equitable nature, against each Defendant.

Respectfully Submitted,

/s/ John G. Watts
**John G. Watts ASB-5819-T82J**
**Attorney for Plaintiff**

**OF COUNSEL:**
Watts Law Group, P.C.
15 Office Park Circle, Suite 206
P.O. Box 531168
Birmingham, AL 35253
(205) 879-2447
(205) 879-2882 *facsimile*
john@wattslawgroup.com

/s/ M. Stan Herring
**M. Stan Herring ASB-1074-N72M**
**Attorney for Plaintiff**

**OF COUNSEL:**
M. Stan Herring, P.C.
201 Avon Place
700 29th Street South
Birmingham, AL 35233
(205) 714-4443
(205) 714-7177 *facsimile*
msh@mstanherringlaw.com

**PLAINTIFF DEMANDS A TRIAL BY JURY IN THIS CAUSE.**

/s/ John G. Watts
**Attorney for Plaintiff**

**Serve defendants via certified mail at the following addresses.:**

AmSher Collections Services, Inc.
c/o Martin Sher
1816 Third Avenue North
Birmingham, Alabama 35203

Premiere Credit of North America, LLC
c/o CSC Lawyers Incorporating Svc Inc
150 South Perry Street
Montgomery, Alabama 36104

# EXHIBIT

## "A"



► Close Window

NOVEMBER 12, 2007

COVER STORY
By **Robert Berner** and **Brian Grow**

# Prisoners of Debt
**The fresh start promised by bankruptcy is under attack as big lenders keep squeezing money out of consumers whose debts were canceled by the courts**



In a financial version of *Night of the Living Dead*, debts forgiven by bankruptcy courts are springing back to life to haunt



**COVER
STORY
PODCAST**
-

consumers. Fueling these miniature horror stories is an unlikely market in which seemingly extinguished debts are avidly bought and sold.

The case of Van Rathavongsa illustrates how canceled debts regain vitality. The Raleigh (N.C.) factory worker pulled himself out from beneath a mountain of bills by means of a bankruptcy proceeding that wrapped up in 2002. One of the debts the judge canceled, or "discharged," was $9,523 Rathavongsa owed to Capital One Financial (**COF** ), the big credit-card company. But Capital One continued to report the factory worker's discharged debt to credit bureaus as a live balance, according to documents filed in U.S. Bankruptcy Court in Raleigh.

This kind of failure by creditors to update credit reports happens with some frequency, consumer lawyers and court-employed bankruptcy trustees say. And it can have consequences: In September, 2003, when Rathavongsa tried to close on a $274,650 mortgage for a new house, his would-be lender, Wachovia (**WB**
), said he would either have to pay Capital One or show proof from the credit-card company that the debt had been discharged. Despite several calls and a letter from his attorney, he says, Capital One never revised the credit report. To obtain the home loan, Rathavongsa eventually did what many consumers in this situation do. He gave in and paid Capital One $9,523 he no longer legally owed.

**`HAPPENS ALL THE TIME, YOUR HONOR'**
Because of episodes like this, discharged debts have attracted the attention of little-known firms expert at buying and selling a range of delinquent consumer obligations. Back-due bills with a face value of billions of dollars change hands at a steep discount every year. Five of the companies in this business are publicly traded on Nasdaq. Others have large private-money backers. B-Line, in Seattle, was acquired last year by the Dallas-based hedge fund firm Lone Star Funds. The investment bank Bear Stearns (**BSC** ) owns two bankruptcy-debt buyers: Max Recovery and eCast Settlement.

The very existence of this marketplace confounds even some veterans in the bankruptcy field. During a preliminary hearing in New York in March, U.S. Bankruptcy Judge Robert Drain asked a lawyer for JPMorgan Chase (**JPM** ) how the bank had managed to sell consumer credit-card debts that had been discharged. "I don't know who would buy a discharged account," the perplexed judge said.

"Happens all the time, your honor," the Chase lawyer, Thomas E. Stagg, responded.

Drain's confusion is understandable. Traditionally, discharged debt was seen as not worth the paper it's written on. Once a judge excuses some of a debtor's obligations—part of the bankruptcy system's goal of granting a financial fresh start—that person has no legal duty to pay them. In fact, bankruptcy law prohibits efforts to collect discharged debt.

In the 1990s, businesses adept at tracking and trading consumer debt expanded their reach to dabble in accounts enmeshed in bankruptcy. That dabbling has grown into a robust market. Some of the trade in so-called bankruptcy paper involves debts that remain collectible. What's troubling is that the market now also includes billions in discharged debts, which ought to have no dollar value. Owners

of canceled liabilities can revive their value in two main ways: by directly pressuring consumers to cough up cash or by gaming the credit system, as allegedly happened in the Rathavongsa case.

### `CAVALIER ATTITUDE'

The Raleigh man filed a motion in bankruptcy court in November, 2003, asserting that Capital One had improperly failed to update his credit report. U.S. Bankruptcy Judge A. Thomas Small agreed. Capital One, Small wrote in December, 2003, "most likely received notice" of Rathavongsa's bankruptcy filing, as indicated by the company's having ceased trying to collect the debt. Because Capital One never responded to Rathavongsa's motion, the judge wrote, "the court can assume that Capital One filed the erroneous credit report for the purpose of pressuring Rathavongsa to pay a discharged debt." In February, 2004, the judge ordered the company to repay the $9,523, as well as $14,000 in fines and attorney's fees for its "cavalier attitude toward the debtor's motion."

A Capital One spokeswoman, Tatiana Stead, says: "Our records show we did not receive proper notice regarding the bankruptcy notice or subsequent discharge of Mr. Rathavongsa's account." The company has paid what the judge ordered "to put an end to the matter and avoid the additional expenditure of resources that would have been required to appeal the judge's ruling," she says.

Consumer lawyers and even some longtime players in the bankruptcy-paper market say they're worried that the trading of canceled debt encourages unsavory efforts to collect on discharged debt. "What you are highlighting is a significant abuse in the industry," acknowledges William Weinstein, a former chief executive of B-Line and a pioneer in the debt-buying business. Speaking generally and not about his former company, he confirms that some lenders and debt buyers simply hound consumers to pay debts that have been canceled, while others refrain from informing consumer credit bureaus when debts are eliminated. "The failure to accurately update credit reporting has allowed unscrupulous activity to prosper," says Weinstein. He left B-Line last year after it was purchased by Lone Star for an undisclosed sum, a departure marked by now-settled litigation between Weinstein and his former company. B-Line's current president, Rui Pinto-Cardoso, says the firm doesn't engage in the practices Weinstein describes.

### `AN ALLEGED TRAP' FOR DEBTORS

The pair of plaintiffs whose case in New York came before Judge Drain in March alleged they had been hurt by credit reports that hadn't been brought up to date. Yvette R. Torres and Ariadna Mateo had owed Chase a total of $7,674 on three credit-card accounts. Those debts were discharged years earlier during proceedings under Chapter 7 of the U.S. Bankruptcy Code. Torres and Mateo sued Chase because the three accounts continued to appear on their credit reports, as if they were live. According to a hearing transcript, the judge said he was suspicious about why Chase hadn't updated the reports when it received routine court notices of the discharges. Chase, the judge speculated, might have been trying to use the incorrect credit reports as a way to pressure the debtors to pay off the discharged debt. Further, the judge said, "the only reason Chase could sell it is because someone believed they could collect on it."

On May 3, Judge Drain denied Chase's motion to dismiss the central claim by Torres and Mateo. "The essence of the plaintiffs' allegations is that Chase has continued to lay a trap for them until the eventual day that they need an accurate credit report," the judge said in a written ruling. "Such behavior, if proven at trial, would be sufficiently vexatious and oppressive to support at least sanctions in the amount of plaintiffs' costs and expenses incurred in releasing the trap." A trial date hasn't been set.

Denying any infraction, Chase has said in court papers that it didn't try to collect debts improperly and that it had no legal duty to update the credit reports. In a prepared statement, Chase spokeswoman Tanya Madison adds that the lender generally "does not attempt to collect a debt once we learn that the account is included in a bankruptcy filing." Chase notifies credit bureaus that an account is "subject to a bankruptcy" within 60 days of the lender learning of a bankruptcy filing, Madison says. She declines to comment on Chase's sale of discharged debts or on any suit.

Other judges warn that the secondary market in bankruptcy paper is encouraging improper collection tactics, which increase the potential value of that debt. William R. Sawyer, a U.S. bankruptcy judge in Montgomery, Ala., says that in the past two years he has seen a surge in cases alleging that lenders and debt buyers have purposefully neglected to report the discharge of debt to credit bureaus. The ploy, he says, is an "indirect means" of pushing consumers to pay debts they no longer really owe. "Creditors and collectors are skating as close as they can to the law and really trying to diminish its value."

### AN INDUSTRY TRANSFORMED

There aren't any reliable statistics to document this development, however, and the legal parameters remain murky. Since 1986 the staff of the Federal Trade Commission has issued a series of formal "opinion letters" saying that the credit bureaus should report when debts have been discharged. Clarke W. Brinkerhoff, an FTC staff attorney who wrote two of the letters, says that in the view of the commission, creditors must inform credit bureaus that the discharged accounts have a zero balance. But that obligation doesn't appear in any statute.

Ambiguities abound. Bankruptcy judges are divided on whether a lender's failure to update a credit report can be considered an improper attempt to collect. The Fair Credit Reporting Act requires credit bureaus to ensure "maximum possible accuracy" of their reports, but the bureaus are allowed to rely on lenders to provide debt information. "These laws were not written for the way this industry has been transformed," says Ronald J. Mann, a law professor at Columbia University. Nevertheless, Representative Jerrold Nadler (D-N.Y.), a member of the House Judiciary Committee, says the Justice Dept. should investigate whether creditors and debt buyers are trying to collect discharged debts. "Documented abuses have largely gone unpunished," he says.

Belinda Hedge knows more about bankruptcy law than the average non-lawyer from working as a debt collector for a student loan firm. She filed for protection from creditors in November, 2005, in part, she says, because a friend-turned-identity-thief opened credit-card accounts in Hedge's name and ran up $12,079 in bills. In March, 2006, most of her debts, including two credit-card accounts with Capital

One totaling $2,414, were discharged by the U.S. bankruptcy court in Knoxville, Tenn. "Once you file, they're supposed to cease all contact," says Hedge.

But last year, Capital One and two debt collectors it hired tried more than 140 times by phone and mail to collect on one of the discharged accounts, according to letters and a phone log the 41-year-old Hedge kept. She sent the company and its collectors court records from her bankruptcy, but the calls continued. Collectors have called her mother and brother 10 times and threatened to contact her employer and garnish her wages, Hedge says. Stead, the Capital One spokeswoman, attributes the collection attempts to the lender's failure to update Hedge's credit report to reflect the discharge, and says that it is correcting the error. Capital One doesn't "conduct direct collection efforts [on] accounts after they have been discharged," she adds.

## SPREADING MISBEHAVIOR
Hedge's experience isn't unusual, says Brian Budsberg, a Tacoma (Wash.) U.S. bankruptcy trustee, a court official who oversees bankruptcy cases. Budsberg says his impression is that the number of debtors alleging collection abuse "is greater than it has ever been." Trustees elsewhere agree. Lately, Budsberg says, he has observed "an emboldened attitude by the collection arms of credit-card companies and debt buyers."

The market in discharged debt has its roots in the early 1990s, when lenders began to seek at least minimal returns from overdue consumer accounts. The stale debts included those of customers who had filed under Chapter 7, saying they couldn't pay their bills, and those who filed under Chapter 13, a provision allowing individuals with some resources to set up schedules to pay creditors. Creditors are notified by the court when a consumer files bankruptcy, and again when a discharge is granted.

Some lawyers and bankers saw a business opportunity in the bulk acquisition of bankrupt paper. "It was a new niche. Banks didn't understand what it was worth," says Charles Rusbasan, a former executive with Chemical Bank before it acquired Chase and adopted the Chase name. Rusbasan approached Bear Stearns in 1992 to finance a debt-buying operation, and that led to the birth of Max Recovery. Today he is CEO of Max Recovery, which is in London, and its sister, eCast Settlement in New York. He is also a senior managing director at Bear Stearns.

Rusbasan says that the keys to success in this esoteric field are buying debt very inexpensively—it can sell for a fraction of a cent on the dollar—and employing proprietary software to track debts as they move through the bankruptcy process. He plays down his companies' trading in debt discharged under Chapter 7, saying most of his business has focused on Chapter 13 debt, which is supposed to be repaid. Bear Stearns doesn't break out the financial results of its debt-buying units, but filings by publicly traded debt buyers show they are highly profitable. Norfolk (Va.)-based Portfolio Recovery Associates (**PRAA**) earned $44 million in 2006 on $188 million in revenue, a margin of 23%. Portfolio Recovery said in its 2006 annual report that it had paid $55 million to buy debts with a face value of $6.3 billion that had gone into bankruptcies since 2004. (It didn't distinguish between Chapter 7 and Chapter 13 cases.)

Rusbasan says that sales of Chapter 7 debt are growing. One large bank, which he won't name, is planning a bulk sale of Chapter 7 debt this fall with a face value of $3 billion, he says. He expects similar mass sales later this year and next.

B-Line's former CEO, Weinstein, who started the company in 1997, takes credit for helping build the market for Chapter 7 debt. Even debt initially designated as discharged can bring legitimate returns, he says. In some cases, bankruptcy courts discover that Chapter 7 debtors have additional assets, which are then divided among creditors. Other Chapter 7 cases are moved to Chapter 13 or dismissed altogether, making debts potentially collectible. In a tiny fraction of cases, people repay discharged debts out of a sense of moral duty.

Increased competition recently in the bankruptcy-paper market has driven up the price of discharged debt—from 1/20th of a cent on the dollar to 3/20ths, or higher—and that has helped spur more aggressive collection tactics, Weinstein says. He says he hasn't participated in any improper conduct.

## SECOND THOUGHTS
Raymond P. Bell Jr. sees worrisome efforts to collect on discharged debts from his perch as vice-president of the bankruptcy and probate division of Creditors Interchange in Abington, Pa. His unit collects on a variety of bankruptcy paper for banks and debt buyers, clients Bell won't name. A veteran of 43 years in the field, he agrees that intensifying competition has led some "cowboys" to try to collect on discharged debts. In early 2005, an analysis of several hundred accounts from one client showed that 85% had been discharged in bankruptcy. Rather than try to squeeze money from those accounts, Bell says he dropped the client.

One company that plays a middle-man role in the bankruptcy-paper market has had second thoughts. Online marketplace CreditMax, based in West Palm Beach, Fla., says it has brokered more than $1.2 billion in bad loans. That includes 25 to 30 bulk sales of Chapter 7 credit-card debt, each with $1 million to $10 million of face value, to two major buyers. But in response to questions from *BusinessWeek*, CreditMax said on Aug. 21 that it would stop selling Chapter 7 debt. In an e-mail, company founder Stephen Kass called the move "socially responsible," without further explanation.

There's no evidence of a rush to imitate CreditMax. A rival, DebtConnection.com, posted on June 20 an offer to sell a batch of Chapter 7 bankruptcy accounts with a face value of $200 million. The sale was on behalf of Collect America, one of the nation's largest debt buyers and collectors. The posting said the bankruptcy cases had an average filing date of April, 2006. Most Chapter 7 cases are resolved within about six months, which means many of the accounts would have been discharged by the time they were sold into the secondary market. John Curry, a senior vice-president at Collect America, declines to discuss the June 20 sale. But discharged debts, he says, are finding eager purchasers. "There are companies—that is all they buy," he says. Manny Newburger, a name partner with Austin (Tex.) law firm

Barron, Newburger, Sinsley & Weir, which represents Collect America, says that his client isn't aware of abuse by buyers of such debts.

But at the same law firm, another attorney for lenders and debt buyers frets that the heating up of the bankruptcy-paper market portends misuse of tools like the credit report. "There is a sense that people are using it as a weapon," says Barbara M. Barron, the firm's managing member. After Chapter 7 cases, "debtors expect their credit is going to become pristine," she notes. "But now you have people who buy the debts, even bankruptcy debts, and all of a sudden, new people are supplying information to the credit bureaus." She adds: "The way the system is working now, it doesn't give [debtors] that fresh start."

**SOLD AND THEN RESOLD**
The case of John Pfister, in which Barron Newburger has no role, provides one illustration. Pfister, 63, a retired AT&T (**T** ) technical supervisor in Denton, Tex., received a Chapter 7 discharge in 2001. Then, last January, while applying for a mortgage, he learned that two discharged credit-card debts, a Discover Card balance of $6,306 and a former Chase account for $2,683, were showing up on his credit reports. Lenders turned him away because of what appeared to be unpaid obligations, he says.

The Chase loan has been sold twice and is now owned by a debt buyer called Pinnacle Credit Services, according to Pfister's reports from credit bureaus TransUnion and Experian. Pinnacle reported to those credit bureaus as recently as May—six years after the bankruptcy discharge—that the debt is still subject to collection. In addition, Pinnacle has given the former Chase debt a new account number. Pfister's lawyer, James J. Manchee, says that creating a new account number is a strategy some debt buyers use to make it more difficult to tie accounts back to discharged debts, and therefore make the debts appear collectible. Pinnacle declined to comment. In June, Quicken Loans became the 12th mortgage lender to reject Pfister.

Exacerbating Pfister's frustration, collectors for Discover were still leaning on him as recently as late August, despite his having faxed them a copy of his bankruptcy papers. On Sept. 20, he sued Discover in U.S. Bankruptcy Court in Dallas. Contacted by *BusinessWeek*, a Discover spokeswoman blamed the collection attempts on administrative error and said Pfister's credit report has now been corrected. She declined to discuss the lawsuit.

Berner is a correspondent for *BusinessWeek* in Chicago and Grow is a correspondent in *BusinessWeek*'s Atlanta bureau

Advertising | Special Sections | MarketPlace | Knowledge Centers

Terms of Use | Privacy Notice | Ethics Code | Contact Us

Xerox Color. It makes business sense.

The McGraw-Hill Companies

Copyright 2000- 2008 by The McGraw-Hill Companies Inc.
All rights reserved.